Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1079 | **DATE** | 7/11/2002 |
| **CASE TITLE** | Sebron Floyd vs. Manessa Nelson, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 7/30/02 at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Summary judgment motions of Defendants Sheahan (Doc. No. 36-1); Nelson, Bucalo and Budz (Doc. No. 41-1), and McHughes and Dorociak (Doc. No. 40-1), are granted. The DHS Defendants' motion to strike (Doc. No. 62-1) or to deem admitted (Doc. No. 62-2) portions of Plaintiff's Rule 56.1 Statements is denied as moot. This case is set for status conference on July 30, 2002 at 9:00 a.m. for further proceedings on Plaintiff's claim against Defendant Castillo.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUL 1 2 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 7/11/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV | |
| | | | mailing deputy initials | |

CLERK, U.S. DISTRICT COURT

02 JUL 11 PM 3: 33

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| SEBRON FLOYD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 00 C 1079 |
| | ) |
| MANESSA NELSON, CAROL BUCALO, | ) Judge Rebecca R. Pallmeyer |
| TIMOTHY BUDZ, MICHAEL McHUGHES, | ) |
| KENNETH DOROCIAK, DANIEL CASTILLO, | ) |
| AND MICHAEL SHEAHAN, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

In September 1999, Plaintiff Sebron Floyd was in the custody of the Illinois Department of Human Services ("DHS" or "the Department") prior to trial on the Department's petition to have him declared a sexually violent person. He claims three Cook County deputies attacked him without cause in the criminal court building. In this lawsuit brought under 42 U.S.C. § 1983, he alleges the deputies, the Cook County Sheriff, and officers of the DHS are liable for violating his rights under the Eighth and Fourteenth Amendments. Named as Defendants are DHS deputies Manessa Nelson and Carol Bucalo, who transported Plaintiff to the courthouse; DHS director Timothy Budz; Cook County Deputies Daniel Castillo, Kenneth Dorociak, and Michael McHughes; and Cook County Sheriff Michael Sheahan. Six of the seven Defendants now move for summary judgment.[1] For the reasons explained here, the motions are granted.

## FACTUAL BACKGROUND

### 1.      The Parties

Plaintiff Sebron Floyd is currently serving a five-year sentence in the Illinois correctional system for an aggravated battery he committed on December 25, 1999. (Plaintiff's Deposition ("Pl.'s Dep.") of August 29, 2001, Exhibit 1 to Plaintiff's Local Rule 56 Statement of Undisputed

---

[1]      Defendant Castillo filed an answer to the Complaint, but has not moved for summary judgment.

Facts ("Pl.'s 56"), at 14, 19, 48.) At the time of the events giving rise to this controversy, Mr. Floyd was a pre-trial detainee held pursuant to the Sexually Violent Persons Commitment Act. 725 ILCS 207/1 *et seq.* ("SVP Act").[2] (Defendants Nelson, Bucalo, and Budz's Local Rule 56.1(a)(3) Statement of Undisputed Facts ("DHS Defs.' 56") ¶ 1; Plaintiff's Local Rule 56.1(b)(3) Reply to DHS Defs.' 56 ("Pl.'s DHS 56") ¶¶ 1, 4.)

At all relevant times, Defendants Manessa Nelson and Carol Bucalo were employed as Security Therapy Aids ("STAs") by the DHS Treatment and Detention Facility ("the Facility") in Sheridan, Illinois. (Declaration of Manessa Nelson ("Nelson Decl."), Exhibit 4 to DHS Defs.' 56 ¶ 1; Declaration of Carol Bucalo ("Bucalo Decl."), Exhibit 5 to DHS Defs.' 56 ¶ 1; DHS Defs.' 56 ¶ 2; Pl.'s DHS 56 ¶ 2.) As STAs, their responsibilities included transporting persons awaiting trial under the SVP Act and guarding parties who had been judged sexually violent persons under the Act. (Nelson Decl. ¶ 2; Bucalo Decl. ¶ 2.) Both STAs received training at the Illinois Department of Corrections Training Academy in matters ranging from the rights individuals have under the law; the uses of security, custody and control techniques; legal standards applicable in a secured facility; writ/furlough transfer; and segregation procedures. (Nelson Decl. ¶¶ 3, 4; Bucalo Decl. ¶¶ 3, 4.) Bucalo and Nelson both believe that with the exception of weapons training, which they did not receive because STAs do not carry guns, their training was the same as that received by Illinois correctional guards. (Nelson Decl. ¶ 3; Bucalo Decl. ¶ 3.)

Defendant Timothy Budz was Director of the Facility at the time of the alleged events giving rise to this controversy. (Plaintiff's Third Amended Complaint ("Compl.") ¶ 12; DHS Defs.' 56 ¶ 3.) Defendants Daniel Castillo, Kenneth Dorociak, and Michael McHughes were employed as Cook County Correctional Officers at all relevant times. (Compl. ¶ 20; Defendant Castillo's Answer ¶ 20;

---

[2]    The SVP Act authorizes the DHS to detain individuals accused of being sexually violent persons until they have received a civil trial resulting in an order of discharge or commitment. 725 ILCS 207/30. After Plaintiff pleaded guilty to the aggravated battery charge on May 19, 2000, the civil SVP charges against him were dropped before he ever went to trial. (Pl.'s Dep., at 19, 48-49.)

Defendant Dorociak's Answer ¶ 20; Defendant McHughes's Answer ¶ 20.) Defendant Michael Sheahan was employed as the Sheriff of Cook County at the time of the alleged occurrences and continues to hold that position. (Compl. ¶ 25.)

## 2.    Plaintiff's SVP Proceedings

In November 1993, Plaintiff was convicted of sexual assault, and was sentenced to 14 years in custody. (Pl.'s Dep., at 22-23; DHS Defs.' 56 ¶ 7; Pl.'s DHS 56 ¶ 7.) After Plaintiff served some fraction of that sentence, and was scheduled for release, the State of Illinois petitioned to civilly commit him, based on its determination that his background fit the profile of an SVP.[3] ( Pl.'s Dep., at 42-44; DHS Defs.' 56 ¶ 8; Pl.'s DHS 56 ¶ 8.) Pursuant to the SVP Act, Plaintiff was housed at the DHS Facility in Sheridan until his civil commitment trial could be heard.[4] (Pl.'s Dep., at 44; DHS Defs.' 56 ¶ 9; Pl.'s DHS 56 ¶ 9.)

## 3.    Events of September 20, 1999

On September 20, 1999, Defendants Nelson and Bucalo transported Plaintiff from the Facility to the criminal courthouse at 26th and California in Chicago pursuant to a writ that had been issued in a case against Plaintiff's brother. (Pl.'s Dep., at 51-52, 67-68; Plaintiff's Affidavit ("Pl. Aff."), Exhibit 2 to Pl.'s 56 ¶¶ 1-2; DHS Defs.' 56 ¶ 12; Pl.'s DHS 56 ¶ 12.) After arriving at the courthouse at approximately 8:55 a.m., Defendants Nelson and Bucalo escorted Plaintiff through the back of the building and to an elevator used to transport detainees to courtrooms within the building. (Pl.'s Dep., at 54-58; Nelson Decl. ¶¶ 5-6; Bucalo Decl. ¶¶ 5-6.) Plaintiff was handcuffed, and shackled around his hands, waist, and feet. (Pl.'s Dep., at 54, 66; Pl. Aff. ¶ 3; Pl.'s 56 ¶ 3.)

Plaintiff entered an elevator with Defendants Nelson and Bucalo. (Pl.'s Dep., at 58; DHS Defs.' 56 ¶ 14; Nelson Decl. ¶ 7; Bucalo Decl. ¶ 7.) As the elevator door began to close, Defendant

---

[3]    The record before the court does not indicate when Plaintiff's sentence ended or when the state filed its petition under the Act. There is no indication on the record that Plaintiff was ever released from state custody.

[4]    The parties have not indicated whether a date was set for Plaintiff's SVP trial before his aggravated battery conviction and plea bargain supplanted the SVP proceedings.

McHughes entered the elevator with a few individuals in custody and directed Defendants Nelson, Bucalo, and Plaintiff to move over.[5] (Pl.'s Dep., at 58; Defendant Bucalo 9/20/99 SVP Program Incident Report ("Bucalo Rep."), Group Exhibit 2 to DHS Defs.' 56; Defendant Nelson 9/20/99 SVP Program Incident Report ("Nelson Rep."), Group Exhibit 3 to DHS Defs.' 56; Defendants McHughes and Dorociak's Rule 56 Statement of Material Facts ("Deputies' 56") ¶ 7.)[6]

The parties disagree over what happened next. Either Defendant Nelson (Bucalo Rep; Nelson Rep.; Pl.'s Dep., at 59, 88), or Plaintiff (Deputies' 56 ¶ 6) told Defendant McHughes that Plaintiff could not be transported on the same elevator as inmates. Plaintiff told McHughes that "I can't be on the elevator with them guys, you know, I'm not–I'm not–I'm not no inmate." (Pl.'s Dep., at 59, 88; Nelson Decl. ¶ 8; Bucalo Decl. ¶ 8.) Either following an order from McHughes (Nelson Rep.; Nelson Decl. ¶ 8; Bucalo Decl. ¶ 8) or acting on his own accord (Pl.'s Dep., at 59, 74), Plaintiff announced that he and his guards would get off the elevator; and Plaintiff attempted to exit the elevator. (Pl.'s Dep., at 59, 74.)

As Plaintiff began to walk past Defendant McHughes, McHughes placed his left hand on Plaintiff's right shoulder, his left forearm against the top of Plaintiff's back, and his right arm on the small of Plaintiff's back and propelled him into a wall that was five or six feet from the elevator. (Pl. Dep., at 59, 74-75, 94, 136; Nelson Rep.; Bucalo Rep.; Nelson Decl. ¶ 10; Bucalo Decl. ¶ 10; Deputies' 56 ¶ 7.) Plaintiff alleges that he was "grabbed" and "slammed . . . into the wall," (Pl.

---

[5]     The record does not indicate precisely how many inmates were in McHughes' control or why he alone was responsible for them.

[6]     Defendants McHughes and Dorociak argue that the DHS reports filed by Defendants Nelson and Bucalo on the day of the incidents alleged by Plaintiff are hearsay. It is well-established that evidence submitted in summary judgment motions must be admissible under the Federal Rules of Evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). Without resolving an issue that is unnecessary to the disposition of this case, the court notes that the incident reports might well be admissible as records of regularly conducted activities public records and reports. *See* FED R. EVID. 803 (6), 803 (8). Although Defendants Bucalo and Nelson have not provided the authentications that the hearsay exceptions require, the court assumes they are able to remedy this oversight. The court notes further that there appear to be only a few potential factual discrepancies between Defendants' admissible declarations and the controverted incident reports, all of which the court has read in Plaintiff's favor for the purposes of this ruling.

4

Dep., at 59, 74-75), while other witnesses say he was pushed (Bucalo Rep.; Nelson Decl. ¶ 10; Bucalo Decl. ¶ 10; Deputies' 56 ¶ 7) or shoved into the wall. (Nelson Rep.) Plaintiff alleges that Defendant McHughes began yelling, "I'll put whoever I want on this elevator, this is my fucking house"; Defendant McHughes denies this allegation. (Pl.'s Dep., at 60; Deputies' Resp. to Pl.'s Add. 56 ¶ 6.) Plaintiff alleges no injury from Deputy McHughes' alleged conduct. (Deputies' 56 ¶ 27; Pl.'s Rep. to Deputies' 56 ¶ 27.) Nor does he hold Nelson or Bucalo responsible for this conduct: Plaintiff testified that Nelson and Bucalo "couldn't have prevented [the push] because only way [sic] they could have prevented it [sic] by her holding my chain, not to release the chain." (Pl.'s Dep., at 125-26.) Plaintiff testified further that Defendant Nelson was holding his chain at the time of the push, but the chain was yanked out of her hand. (Pl.'s Dep. at 126.)

After he hit the wall, Plaintiff repeatedly attempted to turn to his right, presumably either to face McHughes or to avoid facing the wall.[7] (Pl.'s Dep., at 76.) Officer McHughes ordered Plaintiff to "turn around" at least 10 times, apparently in an effort to get Plaintiff to continue to face the wall he had just hit. (Pl.'s Dep., at 59-60, 76, 78; Deputies' 56 ¶ 7.) Plaintiff refused to obey this order, turned to his right, and began arguing with Defendant McHughes, saying, "I'm not turning around, you don't tell me what to do." (Pl.'s Dep., at 59-60, 76; DHS Defs.' 56 ¶ 19; Deputies' 56 ¶ 9; Pl.'s Reply to Deputies' 56 ¶ 9.) Plaintiff alleges that he resisted McHughes' order in self-defense. (Pl.'s Aff. ¶ 13; Pl.'s Dep., at 139.) At some point either immediately before or during this incident, several other Cook County correctional officers, including Defendants Castillo and Dorociak, surrounded Plaintiff in the hallway outside the elevator. (Pl. Aff. ¶ 8; Pl.'s Dep., at 76-77; Bucalo Rep.; Nelson Rep.; Nelson Decl. ¶ 10; Bucalo Decl. ¶ 10; Deputies' 56 ¶ 10.) The Cook County correctional officers proceeded to move Plaintiff down the hallway to an office connected to holding cells.[8] (Pl.'s Dep., at 60, 77-79; Bucalo Rep.; Nelson Rep.; Nelson Decl. ¶ 10; Bucalo Decl. ¶ 10.)

---

[7]     The record does not indicate how far Plaintiff turned away from the wall during this episode.

[8]     Plaintiff also asserts that Defendants McHughes, Dorociak and Castillo threw him
(continued...)

5

Once the Cook County correctional officers had brought Plaintiff into the office, they ordered him more than ten times to sit down on a bench. (Pl.'s Dep., at 60, 79-80, 135; Deputies' 56 ¶ 11; Pl.'s Reply to Deputies' 56 ¶ 11.) Plaintiff backed away, refused to sit, and yelled and cursed at the correctional officers. (Pl.'s Dep., at 60; Nelson Rep.; Bucalo Rep; Nelson Decl. ¶ 12; Bucalo Decl. ¶ 12; Deputies' 56 ¶ 11; Pl.'s Rep. to Deputies' 56 ¶ 11.) Plaintiff alleges that the correctional officers threatened to "break [Plaintiff's] fucking knee" if he didn't sit down. (Pl.'s Statement of Additional Facts ("Pl.'s Add. 56") ¶ 7; Pl.'s Dep., at 60.) Eventually, Defendant Dorociak pushed Plaintiff approximately 2 ½ feet toward a wall from which a concrete bench projected 1 or 1 ½ feet. (Pl.'s Dep., at 94-95; Deputies' 56 ¶ 13.) Plaintiff concedes that Defendant Dorociak's push was an effort to make him sit after he had refused multiple orders to sit down. (Deputies' 56 ¶¶ 13,14; Pl.'s Rep. to Deputies' 56 ¶¶ 13,14.) Plaintiff alleges that he was propelled into a metal ring used for handcuffing inmates that stuck out from the wall above the bench. (Pl.'s Dep., at 61, 80-81, 94-95.) This impact, Plaintiff alleges, caused the ring to gouge into the small of his back, drawing blood.[9] (Pl.'s 56 ¶ 9; Pl.'s Dep., at 81; Pl.'s Aff. ¶ 9.)

Defendants Nelson and Bucalo claim they then attempted to calm Plaintiff down; Plaintiff denies that they did so.[10] (Bucalo Rep.; Nelson Rep.; Nelson Decl. ¶ 13; DHS Defs.' 56 ¶ 27; Pl.'s

---

[8](...continued)
against a wall and window before Defendant Dorociak allegedly pushed Plaintiff. (Pl.'s Aff. ¶ 8.) Defendants deny these allegations. (Deputies' Resp. to Pl.'s Add. 56 ¶ 8.) This assertion contradicts Plaintiff's deposition testimony, however. (Question: "Other than the acts that you have stated, the one with the pushing into the wall [outside the elevator], the other with the pushing into the ring, the third with the slugging into your mouth, were there any other acts of assault?" Pl.'s Answer: "On that day, no, there wasn't.") (Pl.'s Dep., at 87.) The court will, therefore, not address this allegation. "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken." *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998)(*quoting Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)).

[9]      The court notes that Plaintiff's Rule 56 statement cites only Plaintiff's deposition for this allegation. See Pl.'s 56 ¶ 9. The deposition page cited by Plaintiff makes no mention of blood having been drawn by the contact with the ring, however.

[10]     Plaintiff's testimony on this point was equivocal. In his deposition, he said that "after I got slugged in the mouth [Defendant Nelson] told me, 'Oh, just be quiet and sit down.' When
(continued...)

DHS Rep. 56 ¶ 27.) The correctional officers told Defendants Bucalo and Nelson to take Plaintiff into an adjacent room. (Bucalo Rep.; Nelson Rep.) Plaintiff alleges that while in this room, he was taunted by the correctional officers, who called him a "child raper," among other things (Pl.'s Dep., at 61-62; Bucalo Rep.; Nelson Rep.); Defendants McHughes and Dorociak deny this claim (Deputies' Response to Pl.'s Add. 56 ¶ 10). Plaintiff alleges further that Defendant Castillo came over to him and said "Fuck you you fucking rapist, mother fucker, child molesting mother fucker . . . I'll kick your fucking rapist ass you mother fucker." (Pl.'s Add. 56 ¶ 10; Pl.'s Dep., at 61-62.) Plaintiff began calling the correctional officers names and told them that the reason officers were "constantly being shot" in what was a Latin Kings neighborhood was that they do "bogus things" to people. (Pl.'s Dep., at 129-130; Nelson Rep.) Plaintiff told the officers that "As far as the dirt you do it comes back on you, so the dirt you are doing to me, it's going to fall back on you." (Pl.'s Dep., at 130; Deputies' 56 ¶ 19.)

At this point, Plaintiff alleges, Defendant Castillo stepped forward and punched Plaintiff in the mouth with his right fist, splitting open the inside of Plaintiff's right cheek and drawing blood. (Pl. Aff. ¶ 11; Pl.'s Dep., at 83-84, 66-67.) Plaintiff testified that he wiped the blood on his shirt. (Pl.'s Dep., at 102.) The STAs contend they did not see anyone strike Plaintiff, and the Cook County officers deny the incident occurred. (Nelson Decl. ¶ 19; Bucalo Decl. ¶ 17; Deputies' Resp. ¶ 11.) Plaintiff himself concedes he did not see the alleged punch coming, and only knew about it after he had been struck. (DHS Defs. 56 ¶ 31; Pl.'s DHS Rep. 56 ¶ 31; Pl.'s Dep. 156-57.) Both Defendant Nelson and Bucalo did, however, report seeing blood on Plaintiff's shirt soon after the alleged confrontations with the correctional officers. (Bucalo Rep.; Nelson Rep.; Nelson Decl. ¶ 15.) Plaintiff testified that 5 to 10 minutes passed between Defendant Dorociak's push and

---

<sup>10</sup>(...continued)
asked if that was the first time that Nelson had told him to be quiet, Plaintiff responded "Uh-huh, that was the second time she told me to shut up." (Pl. Dep., at 136-37.) Plaintiff's testimony is not necessarily inconsistent with Nelson's having sought to quiet him both after Dorociak's push and after Defendant Castillo's alleged punch.

Defendant Castillo's alleged punch. (Pl.'s Dep., at 132.)

After these confrontations, a Cook County lieutenant approached Plaintiff and the STAs and ordered them out of the building.[11] (Pl.'s Dep., at 62-63; Deputies' 56 ¶ 20; Pl.'s Rep. to Deputies' 56 ¶ 20.) Plaintiff was escorted out of the building to the DHS van that had been used to transport him to the building. (Pl.'s Dep., at 64-65; Deputies' 56 ¶ 21; Pl.'s Rep. to Deputies' 56 ¶ 21.) After approximately an hour, two unspecified Cook County deputies and the DHS STAs escorted Plaintiff to Judge Woods' courtroom for the originally scheduled proceedings. (Pl.'s Dep. 64-65; Deputies' 56 ¶ 22; Pl.'s Rep. to Deputies' 56 ¶ 21.)

The parties have presented conflicting evidence with regard to the extent of Plaintiff's injuries. Plaintiff alleges that he suffered severe back pain after being pushed into the ring and has difficulty sleeping because of the pain. (Pl. Aff. ¶ 15.) Plaintiff alleges further that he can no longer run, play basketball, or lift weights because of the injury. (Pl. Aff. ¶ 15.) Plaintiff contends that he had a huge lump on his back after the alleged incident, was placed on medical restriction because of the incident, and received prescriptions for back rubs and Motrin for the injury. (Pl.'s Dep., at 90, 100; Pl. Aff. ¶¶ 16,17; Plaintiff's Medical Records ("Pl.'s Med. Recs."), Exhibit 5 to Pl.'s 56.) Plaintiff alleges that he has repeatedly seen DHS nurses and doctors for treatment of his back pain. (Pl.'s Dep., at 96-107; Pl.'s Med. Recs.) Defendants Nelson and Bucalo contend that after the alleged incidents, they did not observe any cuts or scratches on Plaintiff's face or body and Plaintiff refused medical attention. (DHS Defs.' 56 ¶ 33; Nelson Decl. ¶¶ 15, 17, 18; Bucalo Decl. ¶ 16.) Nelson and Bucalo note further that during the ride back to Sheridan, Plaintiff voiced no complaints of either injuries or pain, and he did not see a nurse until four or five days after the alleged incidents. (Pl.'s Dep., at 90-91; DHS Defs.' 56 ¶ 34; Pl.'s DHS Rep. 56 ¶ 34; Nelson Decl. ¶ 16; Bucalo Decl. ¶ 15.)

---

[11]     The record before the court does not indicate how much time passed before the unnamed lieutenant arrived on the scene.

## DISCUSSION

### A.    Legal Principles Governing Summary Judgment and § 1983 Liability[12]

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Alexander v. Wisconsin Dep't of Health and Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001). A genuine issue of material fact exists "only if there is sufficient evidence for a jury to return a verdict for that party." *Alexander*, 263 F.3d at 680, *citing Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999)). When making this determination, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Alexander*, 263 F.3d at 680.

Liability under § 1983 requires proof that the defendants were acting under color of state law and that the defendants' conduct violated the plaintiff's rights, privileges, or immunities secured by the Constitution or laws of the United States. *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 471 (7th Cir. 1997). The parties in this case do not dispute that Defendants acted under color of state law during the incidents alleged by Plaintiff; rather, the parties dispute whether the evidence presented by Plaintiff in opposition to Defendants' motions is sufficient to establish a deprivation of Plaintiff's constitutional rights.

---

[12]    The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), requires prisoners to exhaust administrative remedies before bringing § 1983 excessive force claims against correctional officers. *See Porter v. Nussle*, 122 S. Ct. 983, 992 (2002). Defendants in this case have not raised the exhaustion defense, and the court is uncertain of its application to person who, like Plaintiff, were injured while detained pending civil commitment proceedings. In any event, the court finds alternate grounds for dismissing Plaintiff's suit. *See Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999) (under PLRA, "[f]iling suit before exhausting prison remedies . . . is not the sort of defect that judges must notice . . . if the defendant is happy to contest the suit on the merits.").

**B.      Defendant Sheahan**

Plaintiff alleges that Defendant Sheahan failed to adequately train deputies or put in place proper supervision or regulations regarding inmates in the SVP program. Because Plaintiff's complaint does not specify whether Defendant Sheahan is sued in his individual capacity, the court construes this as an official capacity claim. *See Stevens v. Umstead*, 131 F.3d 697, 706 ("A § 1983 claim that fails to specify the capacity in which the defendants are being sued is ordinarily construed to be against them in their official capacity.")[13] A suit against a government officer in his official capacity is actually a suit against the government entity for which the officer works, *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), in this case, Cook County. In order to establish liability against the County, Plaintiff must prove that the alleged assault (1) resulted from either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the County, which (2) was the proximate cause of his injury. *See Ineco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002), *citing Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

Plaintiff has failed to make a prima facie case against the County. Plaintiff concedes that (1) the Department of Human Services, and not the County, is responsible for the care and custody of SVPs such as Plaintiff (Plaintiff's Rule 56 Reply to Defendant Sheahan's Rule 56 Statement of Material Facts ("Pl.'s 56 Sheahan Rep.") ¶ 2); (2) that the Court Services Department of the County's Sheriff's Office does not have any written policies governing the handling of SVPs (Pl.'s 56 Sheahan Rep. ¶ 4); (3) that he lacks evidence indicating that the County's policies and

---

[13]      The court recognizes its discretion to interpret a claim as against an official in his or her individual capacity if the actions of the parties, since the filing of the complaint, demonstrate that they assume this to be the case. *See Stevens*, 131 F.3d at 706. There is no indication, however, that the parties to this case have operated under that assumption. To the contrary, Defendant Sheahan has explicitly and consistently represented in court filings that he is responding in his official, and not his individual, capacity. The court notes further that any claim against Sheahan in his individual capacity would also clearly fail. Neither of the two individual capacity theories summarized below help Plaintiff here: there is no *respondeat superior* liability under § 1983, and there is no indication that Sheahan had any direct involvement in the alleged violation of Plaintiff's rights.

procedures were deliberately chosen to facilitate the assault he allegedly suffered (Pl.'s 56 Sheahan Rep. ¶¶ 11-12); and (4) that he lacks evidence indicating that the County deliberately chose to train officers to assault inmates or SVPs. (Pl.'s 56 Sheahan Rep. ¶ 14.)

Moreover, Plaintiff has failed to cite any other misconduct by County officers toward SVPs, so that there is no evidence on the record from which a jury could reasonably infer that the alleged attack was anything more than an isolated set of circumstances. In short, Plaintiff has proffered evidence of neither a County policy nor a widespread custom of mistreatment of SVPs. Nor has Plaintiff shown that the County's training program evidences a "deliberate indifference" to his rights, reflecting a "deliberate" or "conscious" choice by Defendant Sheahan. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Thus, for example, the record fails to indicate how the Sheriff's Office might have been put on notice that its officers might mistreat SVPs, or how the allegedly inadequate training policy could have caused Plaintiff's injuries. Accordingly, Defendant Sheahan's motion for summary judgment is granted.

## C.    Defendant Budz

Plaintiff alleges that Defendant Budz violated his Eighth and Fourteenth Amendment rights by hiring unqualified employees, failing to properly train DHS employees after hiring, and failing to properly supervise and regulate the SVP program. Once again, the complaint does not specify whether Budz is sued in his official or individual capacity. Although as noted above this omission would ordinarily create a presumption that the official faced suit in his official capacity, the parties' conduct during the course of this litigation raises significant questions about their understanding of this claim. *See* Pl.'s Memorandum of Law in Defense of DHS Defendants' Motion for Summary Judgment, at 10, contending that Defendant Budz is "directly responsible" for the alleged failures to hire and train employees properly; Def.'s Motion for Summary Judgment on Behalf of DHS Defendants, at 4, arguing in the alternative that Defendant is "entitled to qualified immunity." The court need not resolve this issue, however, because Defendant Budz is entitled to summary judgment in either his official or his individual capacity.

As an initial matter, it is well-settled law that § 1983 actions for damages do not lie against either state officers in their official capacities or the states that employ them. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n. 24 (1997); *Zambrano v. Reinert*, No. 01-2724, — F.3d —, 2002 WL 1065972, at *10 (7th Cir. May 29, 2002). Because DHS Director Budz is a state officer, this court can provide no remedy for a § 1983 damages suit against Defendant Budz in his official capacity.

It is also well-settled that the doctrine of *respondeat superior* does not apply to § 1983 actions. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). Thus, to be held individually liable, a defendant such as Budz must be "personally responsible for the deprivation of a constitutional right." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001), *quoting Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). While individuals need not have participated directly in a deprivation to be liable, *see McPhaul v. Board of Comm'rs of Madison Co.*, 226 F.3d 558, 566 (7th Cir. 2001), supervisors will only be liable for subordinates' misconduct when they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. [Supervisors] must in other words act either knowingly or with deliberate, reckless indifference" for liability to accrue. *Chavez*, 251 F.3d 651 (quotations omitted).

Plaintiff has not met this standard. Plaintiff has neither alleged nor provided evidence allowing an inference that Defendant Budz knew or should have known that SVPs were ever inadequately protected by DHS security aids. Indeed, Plaintiff conceded in his deposition that he himself knew of no other episodes in which SVPs in the custody of DHS security aids were assaulted or injured by law enforcement officials. (Pl.'s 56 Rep. to DHS 56 ¶¶ 46-47; Pl.'s Dep., at 151, 166-67.) Even after an opportunity for discovery, Plaintiff offers no evidence that such incidents have ever occurred. Finally, it is undisputed that Defendant Budz's subordinates, Defendants Bucalo and Nelson, received hundreds of hours of training on the rights that individuals have under the law; the use of security, custody and control techniques; legal standards applicable in a secured facility; writ/furlough transfer; and segregation procedures–all subjects that might

reasonably have been expected to sensitize DHS STAs to the rights and safety of detainees awaiting SVP proceedings. (Nelson Decl. ¶ 4; Bucalo Decl. ¶ 4.) In sum, Plaintiff has presented no issues of material fact concerning Budz's liability, and the court concludes Budz is entitled to judgment as a matter of law.

## D.    Defendants McHughes and Dorociak

Plaintiff alleges that Defendants McHughes and Dorociak violated his rights under the 8th and 14th Amendments to the federal Constitution by pushing and assaulting him. Specifically, Plaintiff alleges that Defendant McHughes pushed him into a wall opposite an elevator, and Defendant Dorociak pushed him into a wall from which a metal hook projected.

Because Plaintiff was a pre-trial detainee at the time of the alleged events, his excessive force allegations are governed by the Due Process Clause. *See Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989) ("the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment"); *Bell v. Wolfish*, 441 U.S. 520, 535, 537 (1979) (holding that Due Process Clause permits government to incarcerate pre-trial detainees but not to impose punitive conditions on them); *Dorsey v. Saint Joseph County Jail Officers*, 98 F.3d 1527, 1528 (7th Cir. 1996). The Seventh Circuit has noted, however, that "[m]ost of the time the propriety of using force on a person awaiting trial will track the Fourth Amendment: the court must ask whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them." *Titran v. Ackman*, 893 F.2d 145, 147 (7th Cir. 1990). Because the Due Process Clause does not proscribe negligence or even gross negligence, however, this inquiry can not be wholly objective: deliberate indifference is the applicable standard in § 1983 cases alleging excessive force by officials against pre-trial detainees. *Proffitt v. Ridgeway*, 279 F.3d 503, 506 (7th Cir. 2002). At the same time, the Seventh Circuit has held that a factfinder may rely on objective factors in assessing an official's intent. *Wilson v. Williams*, 83 F.3d 870, 876 (7th Cir. 1996). The factors generally relied on in the Fourth Amendment excessive force context include: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the threat

reasonably perceived by the responsible officials; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the injury suffered. *See Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000). Notably, this final factor is most significant: while significant injury is not required, a claim can not ordinarily be predicated on a *de minimis* use of physical force. *DeWalt*, 224 F.3d at 620. Thus, "[n]ot every push or shove, even it if may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Hudson*, 503 U.S. at 9, quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973) (Friendly, J.).

Viewed in the light most favorable to Plaintiff, the evidence shows McHughes engaged in an unprovoked and unnecessary assault on Plaintiff as he attempted to exit the elevator. Still, the court has little difficulty concluding that Defendant McHughes's alleged push constituted a *de minimis* use of force.[14] Plaintiff concedes that he was not injured by the single push, and the court notes further that the incident was less serious than others that have been dismissed as *de minimis* uses of force. In *DeWalt*, for example, the Seventh Circuit affirmed dismissal of an excessive force claim not for the reason articulated by the district judge – that plaintiff failed to show defendant's conduct was motivated by something other than a good faith effort to maintain or restore discipline – but because "a claim ordinarily cannot be predicated upon a *de minimis* use of physical force." 224 F.3d at 619-20. The court concluded that defendant's acts of shoving the prisoner once against a door frame and bruising him were *de minimis*. Similarly, in *Lunsford v. Bennett*, 17 F.3d 1574 (7th Cir. 1994), where defendant poured a bucket of water over the prisoner's head, the court observed:

---

[14]      Plaintiff argues without reference to any authority that Defendants McHughes and Dorociak "had no legal authority to tell [Plaintiff] to do anything, to touch [Plaintiff] in any way, and absolutely not to assault him" because Plaintiff was in the custody of the DHS and not Cook County. Defendants note that under 55 ILCS 5/3-6017, "[The Sheriff] shall have the custody and care of the courthouse and jail of his or her county, except as is otherwise provided." On the facts before it, the court concludes that the Cook County deputies were not barred as a matter of law from issuing orders to or touching Plaintiff within a building they were responsible for protecting.

> Pouring a bucket of water over the head of a prisoner who is already standing
> ankle-deep in water, while it may be seen as unnecessary in retrospect, is a minor
> use of force that does not offend the conscience. We do not advocate or condone
> the officers' conduct in this situation, but find that it does not rise to the level of a
> constitutional violation.

*Id.* at 1582. *Compare Thomas v Stalter*, 20 F.3d 298, 301-02 (7th Cir. 1994) (punching a prisoner

with a closed fist while he was held down by other officers more than *de minimis*). Accordingly, the

court grants the Defendants' motion for summary judgment with regard to Defendant McHughes'

alleged push.

Defendant Dorociak's push appears to have been a *de minimis* use of force as well. The

undisputed facts on the record show that Dorociak pushed Plaintiff only a few feet toward a wall

and a bench, after Plaintiff refused repeated orders to sit. Plaintiff's account suggests that he

would not have suffered any injuries from the push had he not struck a hook projecting from the

wall toward which he was pushed. Notably, Plaintiff does not suggest that Dorociak saw or should

have known about the hook, an issue germane to the overarching issue of whether Dorociak acted

in bad faith as well as the question of whether his push was a *de minimis* use of force. The court

also finds it significant that Plaintiff neither complained of injuries or pain during the return trip from

the Chicago courthouse to the Facility nor sought medical assistance for four or five days after the

alleged incidents. *See Taylor v. McDuffie*, 155 F.3d 479, 484-85 (4th Cir. 1998) (injuries *de minimis*

in part because plaintiff did not seek medical assistance for 12 hours after injuries occurred).

Even if a material question of fact existed concerning the extent of the force used by

Defendant Dorociak, however, the court finds that no jury could reasonably conclude that Dorociak

acted with deliberate indifference to Plaintiff's safety. Under the factors outlined above, an officer

could reasonably conclude that there was a need to apply force to Plaintiff after he repeatedly

refused orders to sit and challenged correctional officers' authority. Plaintiff himself concedes that

Defendant's push was intended to put Plaintiff into a sitting position after his refusal to sit on his

own. Moreover, the underlying orders to sit appear reasonable; a person in custody would

presumably pose less of a security risk from a seated position than from a standing, potentially

mobile one. Second, on the facts before the court, there appears to have been a reasonable relationship between the amount of force used and the security need in question. While the parties may disagree over how hard Dorociak pushed Plaintiff, under the circumstances, a single push toward a nearby bench appears to have been a measured response to Plaintiff's conduct. As noted above, Plaintiff has not alleged that Dorociak knew or should have known about the hook sticking out above the bench towards which he pushed Plaintiff.

The third factor the court must consider is the threat perceived by the officers. Here, the Defendants could reasonably have perceived that Plaintiff's conduct posed some threat to security. Plaintiff's ongoing disobedience and shouting could easily have been interpreted as signs of an imminent confrontation, encouragement for other parties in custody to act up, or a distraction from the officers' other duties within the courthouse. *See, e.g., Ruffin v. Taylor*, 166 F. Supp. 2d 999, 1006-07 (D. Del. 2001) (summary judgment for officers accused of repeatedly punching prisoner-plaintiff in face and beating his arms after he refused to leave his cell or have his cell door chained); *Pittman v. Kurtz*, 165 F. Supp. 2d 1243, 1246 (D. Kan. 2001) (summary judgment for officers accused of punching prisoner-plaintiff in the head and beating his head against the floor after plaintiff repeatedly refused to return to cell and struck guard with a pencil); *Montero v. Crusie*, 153 F. Supp. 2d 368, 374-75 (S.D. N.Y. 2001) (summary judgment for officers accused of excessive force in pushing prisoner-plaintiff into cell after he exposed himself and yelled profanities at them).

Finally, the court considers the officers' attempts to temper their response and the extent of Plaintiff's injuries. In the circumstances presented here, Defendants could be said to have tempered the severity of their use of force in several ways. They repeatedly told Plaintiff to sit before resorting to force, warned him that force would be applied if he continued to stand, and ultimately pushed Plaintiff no more than 2 ½ feet according to Plaintiff's own account. The extent of the injuries Plaintiff suffered from Dorociak's push is uncertain. Drawing all inferences in favor of Plaintiff, the court will assume for the purposes of this motion that his contact with the hook left him with bruises, blood, and ongoing pain. Even so, the fact that Plaintiff may have been injured

does not render Defendant Dorociak's conduct deliberately indifferent to Plaintiff's safety or his use of force excessive. Accordingly, Defendant Dorociak's motion for summary judgment is granted.

## E.    Defendants Bucalo and Nelson

Plaintiff alleges that Defendants DHS deputies Manessa Nelson and Carol Bucalo violated his constitutional rights by failing to segregate him from other inmates as required by the Illinois Administrative Code ("the Code") and failing to intervene to prevent the punch and pushes that he allegedly received from the Cook County correctional officers.

Plaintiff's first allegation is a non-starter. Plaintiff has failed to show that his alleged injuries were causally connected to the alleged failure to segregate. See Berman v. Young, 291 F.3d 976, 982 (7th Cir. 2002); Jones v. City of Chicago, 856 F.2d 985, 993 (noting that "elementary principles of legal causation . . . are as applicable to constitutional torts as to common law torts"). On the record before the court, there is no logical or causal connection between the alleged failure to segregate and the injuries that Plaintiff claims to have suffered. Plaintiff has alleged no wrongdoing by inmates in the courthouse, and the injuries he suffered all occurred after he began to step away from his sole encounter with other inmates.[15] Indeed under Plaintiff's version of events, he was safer in the presence of other inmates than when he was segregated from them.[16] Accordingly,

---

[15]    As noted above, it is not clear whether the individuals escorted onto Plaintiff's elevator by Defendant McHughes on September 20, 1999 were inmates or detainees. For simplicity and in light of the court's disposition of this claim, this portion of the opinion refers to these individuals as "inmates."

[16]    The court notes further that Defendants appear to have complied with all applicable state regulations pertaining to detainees awaiting SVP trials. Notably, Plaintiff has not identified, nor has the court located, any provision of the Illinois Administrative Code that addresses, much less requires, the segregation of detainees awaiting SVP trials from other inmates. Indeed, as the DHS Defendants note, the Code explicitly permits detainees awaiting SVP trials to be held in county jails presumably housing other types of inmates. The Code does not discuss or require any form of segregation in this context. ILL. ADMIN. CODE tit. 59 § 299.210 ("During the course of a trial or when the detained person . . . is ordered by the court to be present in a county, the county jail is approved for use as a temporary detention site. While in the county jail, the jail is responsible for their (sic) care and custody.") Plaintiff cites § 299.200 of the Code in his behalf ("To the extent possible considering operational, programmatic and security needs, detained persons shall be kept separate from committed persons") but does not address the fact that the Code explicitly defines (continued...)

17

the court grants Defendants' motion for summary judgment on Plaintiff's failure to segregate claim.

The court now turns to Plaintiff's failure to intervene allegations. While the Constitution generally creates only negative duties for state actors, omissions or failures to act may violate civil rights. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Thus, for example, the state has an affirmative duty to provide detained, committed, or incarcerated persons with minimum levels of basic human necessities, such as food, clothing, shelter, medical care, and reasonable safety. *Farmer v. Brennan*, 511 U.S. 832 (1994). Because Plaintiff was a detainee and not an inmate at the time of the alleged events, his claim sounds under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's prohibition against cruel and unusual punishment. *See Collignon v. Milwaukee County*, 163 F.3d 982, 986-87 (7th Cir. 1998).[17] As a practical matter, "there is minimal difference in what [the Fourteenth Amendment and the Eighth Amendment] require of state actors." *Id.* at 988.

The conduct of prison officials is measured against the deliberate indifference standard set out in *Farmer*, which held that

> a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837. Under this standard, a plaintiff must show both an objective risk of danger and

---

[16](...continued)
"committed person" as "a person who has been committed by the court *as a sexually violent person*." ILL ADMIN. CODE tit. 59 § 299.120 (emphasis added). Because Plaintiff has not alleged that the inmates with whom he briefly shared an elevator were committed SVPs, this provision does not assist him. *See also Pettit v. Brantner*, No. 86 C 0241, 1987 WL 10309, at *2 (N.D. Ill. Apr. 27, 1987) ("Nothing in [earlier version of the Act] requires that a sexually dangerous person be segregated from all others while undergoing examination.").

[17]     Plaintiff argues that Defendants Bucalo and Nelson's alleged failure to intervene should be assessed under a "simple negligence" standard because as civil detainees, parties accused of being SVPs are entitled to a higher level of protection than a "common inmate." Pl.'s Memorandum of Law in Defense of DHS Defs.' Motion for SJ, at 5. The court is not persuaded by this proposition in light of the Seventh Circuit's discussions of the due process protections afforded to pre-trial detainees. *See Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2000) (in case brought by pre-trial detainee, "[t]he standard against which official conduct is measured is the deliberate indifference standard set out in *Farmer*").

that the defendants had an actual knowledge of the risk. *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999). Within the more specific context of failure to intervene claims, the Seventh Circuit has held that an officer presented with a realistic opportunity to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 for failing to act if the officer had reason to know that: (1) excessive force was being used; (2) a citizen was unjustifiably arrested; or (3) a constitutional violation was being committed by another law enforcement official. *Chavez*, 251 F.3d at 652, *Lanigan v. Village of East Hazel Crest,* 110 F.3d 467, 477 (7th Cir. 1997).

Plaintiff alleges that Defendants Bucalo and Nelson failed to intervene in or prevent three incidents: (1) his being pushed against the wall by Defendant McHughes; (2) his being pushed into the wall and handcuff ring by Defendant Dorociak; and (3) his being punched in the mouth by Defendant Castillo. Plaintiff's own testimony and briefs narrow his claim. In his deposition, Plaintiff acknowledged that Defendants Bucalo and Nelson could not have prevented Defendant McHughes from pushing him. (Pl.'s Dep., at 125-26.) As described by Plaintiff, the push came suddenly and without warning, and the STAs could not possibly have anticipated it. Accordingly, the court concludes that Defendants Bucalo and Nelson did not have a reasonable opportunity to prevent Defendant McHughes' conduct. With regard to Plaintiff's second claim, the court's prior determination that Defendant Dorociak did not violate Plaintiff's constitutional rights is dispositive: absent an underlying constitutional wrong that Defendants could have prevented, Defendants are entitled to summary judgment.[18] Plaintiff is left, therefore, with a claim that the two STAs failed to

---

[18] The court notes further that Plaintiff has effectively conceded that he does not blame Defendant Bucalo for Dorociak's push. *See* DHS Defs.' 56 ¶ 22; Pl.'s DHS Rep. 56 ¶ 22. The DHS Defendants Rule 56 Statement ¶ 22 states that Plaintiff does not fault Defendant Bucalo for failing to prevent the push. Plaintiff's Rule 56 response does not controvert this material fact and therefore concedes it under Local Rule 56.1(b). Moreover, Defendant Nelson would appear to enjoy qualified immunity on the facts alleged by Plaintiff, in light of the facts that Plaintiff repeatedly refused orders to sit down; the Cook County correctional officers had an interest in securing peace and quiet in their building; and the alleged contact between Dorociak and Plaintiff was quite brief. *See Saucier*, 533 U.S. at 205 (qualified immunity warranted where officer has
(continued...)

prevent Defendant Castillo's alleged punch.

Defendants Nelson and Bucalo contend that they are entitled to qualified immunity on the remaining claim. Under the doctrine of qualified immunity, state officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), *Anderson v. Creighton*, 483 U.S. 635, 638 (1987), *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To evaluate a claim of qualified immunity, the court must engage in a two-step analysis. First, the court determines whether the alleged facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Then, the court determines whether those rights were clearly established at the time the alleged violation occurred. *See Saucier*, 533 U.S. at 202, *Khuans v. School Dist. 110*, 123 F.3d 1010, 1013 (7th Cir. 1997). Only if the rights were clearly established may the official be liable for money damages. *See Richardson v. McKnight*, 521 U.S. 399, 403 (1997). A clearly established right is one where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. "Because there is an almost infinite variety of factual scenarios that may be brought into the courtroom, a plaintiff need not point to cases that are identical to the presently alleged constitutional violation." *Denius v. Dunlop*, 209 F.3d 944, 950 (7th Cir. 2000). Nevertheless, an official will not be individually liable unless "the contours of the right . . . have been established so that the unlawfulness of the defendant's conduct would have been apparent in light of existing law." *Id., citing Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430 (7th Cir. 1989).

In the court's view, the evidence may not be sufficient to establish any constitutional violation. Plaintiff has not suggested that the Defendant STAs failed to prevent an ongoing beating. At most, Defendants saw Plaintiff engaged in a heated verbal exchange with a Cook County

---

[18](...continued)
reasonably mistaken understanding "as to whether a particular amount of force is legal").

correctional officer who uttered a vague threat against Plaintiff before throwing a single punch so quickly that Plaintiff himself did not see it coming. There is no evidence that Defendants Bucalo and Nelson had ever seen or worked with Defendant Castillo before, thus making it all the more unreasonable to expect them to anticipate his conduct before it occurred. Without condoning any of the behavior alleged by Plaintiff, particularly the punch allegedly thrown by Defendant Castillo, the court does not believe the law requires state officials to stand on guard every time a fellow officer issues a threat to a recalcitrant party in custody. The court notes further that Defendants raise potentially compelling arguments that they had no realistic opportunity to prevent Castillo's punch, and that the punch resulted in nothing more than *de minimis* injuries.

Even if the court were to find a triable claim of unlawful conduct, the court concludes that Nelson and Bucalo are entitled to qualified immunity on this final claim. Neither Plaintiff nor the court has located any cases in which officers were held liable for failing to intervene to protect a party in custody during the interval between a fellow officer's threat and subsequent attack on the party.[19] Summary judgment is granted in their favor on this issue, as well.

## CONCLUSION

For the reasons stated above, the summary judgment motions of Defendants Sheahan (Doc. No. 36-1); Nelson, Bucalo and Budz (Doc. No. 41-1), and McHughes and Dorociak (Doc. No. 40-1), are granted. The DHS Defendants' motion to strike (Doc. No. 62-1) or to deem admitted

---

[19]     Plaintiff cites six cases in support of his argument that the STAs do not enjoy qualified immunity. None of these cases establishes that prisoners or detainees have a constitutional right to physical protection after a verbal threat by an officer. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (holding that pre-trial detainees have constitutional right not to be punished prior to an adjudication of guilt in accordance with due process of law); *Estate of Porter v. Illinois*, 36 F.3d 684, 688 (7th Cir. 1994) (distinguishing professional judgment standard applied in cases of involuntary commitment of mental patients from deliberate indifference standard applied in prison context); *Collignon*, 163 F.3d at 991 (affirming judgment for prison medical officer accused of failing to protect suicidal inmate); *Salazar v. City of Chicago*, 940 F.3d 233, 239-240 (7th Cir. 1991) (upholding directed verdict in favor of officers accused of deliberate indifference to prisoner's medical needs); *Shaw v. Strackhouse*, 920 F.2d 1135, 1150 (3rd Cir. 1990) (affirming summary judgment in favor of prison officials accused of deliberate indifference in failing to protect prisoner); *Pettit*, 1987 WL 10309, at *2 (dismissing pre-trial detainee's failure to protect claim).

(Doc. No. 62-2) portions of Plaintiff's Rule 56.1 Statements is denied as moot. This case is set for status conference on July 30, 2002 at 9:00 a.m. for further proceedings on Plaintiff's claim against Defendant Castillo.

ENTER:

Dated: July 11, 2002

REBECCA R. PALLMEYER
United States District Judge